IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

JUL 1 2 2006
JUL 12 2006
JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

JOAQUIN RUIZ,

            Plaintiff,

    v.

F&C INDUSTRIES, INC.,

            Defendant.

Case No. 05 C 0958

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Plaintiff Joaquin Ruiz (hereinafter, "Ruiz") filed the instant action against his previous employer, F&C Industries, Inc. (hereinafter, "F&C"), alleging that he was unlawfully terminated in violation of various federal employment laws. Specifically, Ruiz asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. ("Title VII"), for discrimination and retaliation based on his race and national origin (Hispanic/Mexican); under the Americans with Disabilities Act, 42 U.S.C. §§ 12101, et seq. (the "ADA"), based on F&C's purported failure to accommodate his disability; and under the Employment Retirement Income Security Act of 1974, 29 U.S.C. §§ 1140, et seq. ("ERISA"), based on the contention that F&C terminated Ruiz to avoid paying his employment benefits. Ruiz also asserts a number of state law claims against F&C, most of which have to do with alleged physical and emotional abuse Ruiz sustained while on the

job. F&C has moved for summary judgment on all counts. For the reasons stated below, F&C's Motion for Summary Judgment is **granted.**

## I. FACTUAL BACKGROUND

F&C operates a metalworking factory that manufactures tools, dies, and other metal parts. Ruiz began his employment with F&C on January 10, 1990 as a general laborer and worked in that position until his termination in late March 2004. His job responsibilities included running machines, performing janitorial duties, handling scrap, stamping and packaging parts, spot welding, and doing other odd jobs around the factory. Over the course of his employment at F&C, Ruiz maintained a poor attendance record due in large part to a number of medical problems. According to his attendance cards, Ruiz missed 20 days of work in 2001, not including vacation time. He missed another 44 days in 2002 and 48 days in 2003. In March of 2003, Ruiz received a verbal warning based on these excessive absences, which was documented and placed in his personnel file.

F&C is comprised of 16 to 18 employees, approximately 10 of whom are also general laborers. These positions do not require any particular education or specialized training. The remaining employees are either part of the administrative staff or tool and die makers. Tool and die makers require at least a high school education and apprenticeship, or previous experience. All the general laborers at F&C are Mexican (or of Mexican decent), and many of them speak only Spanish. The tool and die makers and administrative staff are exclusively Caucasian.

Florian Czinki ("Czinki") is owner and president of F&C. Ruiz alleges that, over the course of his employment at F&C, he was subjected to derogatory comments and physical abuse by Czinki. Specifically, Ruiz contends that Czinki occasionally called him a "wetback" and used other racial slurs to refer to Mexican workers. Ruiz also alleges that Czinki pushed and hit him on several occasions. Apart from these specific acts, Ruiz contends that F&C discriminated against Mexicans in terms of their job assignments. Ruiz points to the fact that F&C routinely assigned Mexicans to general laborer positions, reserving the more favorable tool and die jobs for Caucasians. In addition, Ruiz contends that only Mexican workers were asked to perform undesirable tasks, such as cleaning bathrooms. According to Ruiz, after he complained about this disparate treatment, F&C terminated him.

F&C denies any discriminatory motive, asserting instead that Ruiz was terminated strictly on the basis of his poor attendance record and refusal to return to work after his hernia surgery. After Ruiz underwent surgery in December 2003, his doctor, Jose Trevino, estimated that Ruiz would require approximately four to six weeks off to recover. About six weeks later, in mid-January, Ruiz informed F&C that he would require an additional four weeks off due to complications from the surgery. On February 28, Ruiz contacted F&C again, stating that he would be unable to return to work for an indefinite amount of time. The uncertainty regarding Ruiz's ability to work continued until March 22, 2004, when Marlene

Gibson, F&C's corporate secretary, called Ruiz to inquire about his status. She was told that Ruiz continued to experience pain from his surgery and that he would not be able to return to work in the foreseeable future. Consequently, Marlene informed Ruiz that he would be terminated from his position, but that the termination would not take effect until the end of June so that Ruiz could take advantage of his remaining disability insurance. Ruiz subsequently filed an EEOC charge on July 7, 2004, and received a right to sue letter on November 22, 2004.

## II. LEGAL STANDARD

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if it could affect the outcome of the suit under the governing law, and a dispute is genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must view all the evidence and any reasonable inferences therefrom in the light most favorable to the non-moving party. *See Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1003 (7th Cir. 2000).

# III. DISCUSSION

As an initial matter, F&C contends that Ruiz failed to file his EEOC charge within 300 days after the alleged unlawful employment practice occurred, thereby precluding his present suit under Title VII. *See* 42 U.S.C. § 2000e-5(e)(1). On this score, however, Ruiz correctly notes that a plaintiff may recover for acts beyond the limitations period if he can demonstrate that such acts were part of a continuing violation. *See Freemen v. Madison Metro. School Dist.*, 231 F.3d 374, 381 (7th Cir. 2000). Since the bulk of Ruiz's claims involve a combination of alleged instances of discrimination, culminating in his ultimate termination, the continuing violation doctrine saves his federal claims from untimeliness. *See National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117-18 (2002). Nevertheless, for the reasons stated below, Ruiz's federal claims fail on substantive grounds.

## A. Title VII Claims

Ruiz bases his Title VII claims on two separate theories. First, Ruiz contends that he was subjected to a hostile work environment as a result of Czinki's racially motivated verbal and physical abuse. Second, Ruiz contends that he was terminated because of his race and nationality. However, even when examining the evidence in the light most favorable to Ruiz, he can succeed on neither of these theories.

To begin, a plaintiff bringing a Title VII claim based on hostile work environment must demonstrate severe or pervasive

harassment based on an immutable characteristic, such as race or gender, and a basis for employer liability. *See Cerros v. Steel Tech., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002). The work environment must be sufficiently severe or pervasive so as to alter the conditions of employment, and must be both objectively and subjectively offensive. *See Gleason v. Mesirow Financial, Inc.*, 118 F.3d 1134, 1143-44 (7th Cir. 1997); *Murray v. Chicago Transit Authority*, 252 F.3d 880, 888-89 (7th Cir. 2001). Yet, not all workplace unpleasantries are actionable, for Title VII was not intended as a "general civility code." *Haywood v. Evergreen Motor Cars, Inc.*, No. 02 C 6508, 2004 WL 31418248, at *6 (N.D. Ill. June 18, 2003).

With these standards in mind, it is clear that no reasonable jury could find that the comments used by Czinki created an objectively or subjectively hostile work environment. Indeed, according to Pedro Mendoza, another Mexican worker at the factory, the Mexican employees themselves jokingly used words such as "wetback" in reference to Czinki and his immigrant status. (Pl. LR 56.1 Statement, Ex. C at 32.) Czinki would then respond in kind. While the employees at F&C may not have been gentlemen, there is nothing to suggest that Ruiz, or any other Mexican worker, actually interpreted this workplace banter as malicious slights on their Mexican heritage. Similarly, Ruiz has presented no evidence, other than his self-serving statements, that Czinki pushed or hit him on account of his race or national origin. Indeed, what Ruiz

now characterizes as racially motivated physical abuse appears to have been nothing more than simple horseplay in which nearly everyone at the factory, Mexican or otherwise, participated. (Pl. LR 56.1 Statement, Ex. C at 13.) And, while it may have become rough at times, Ruiz never complained about it until after his termination. Under these circumstances, Czinki's behavior, although probably crude, does not give rise to the level of hostility required to have altered Ruiz's conditions of employment. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("[O]ffhand comments and isolated instances (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.")

Ruiz's second theory, that F&C terminated him based on his race and nationality, is equally flawed. As an initial matter, Ruiz urges the Court to infer discriminatory animus from the fact that F&C requires its Mexican employees to perform menial tasks, reserving the more desirable tool and die jobs for Americans. The Mexicans to whom Ruiz refers, however, were hired as general laborers, who were responsible for those particular tasks as part of their job assignments. (*See* Pl. LR 56.1 Statement, Ex. A at 25-28.) Moreover, there is no evidence to suggest that any Mexican employees, let alone Ruiz, applied for a tool and die position or asked to be reassigned.

Nevertheless, Ruiz also attempts to prove his Title VII claim using the indirect method under the familiar *McDonnell Douglas*

framework.  *See McDonnell Douglas Corp. V. Green*, 411 U.S. 792 (1973).  To do this, Ruiz must demonstrate that (1) he was a member of a protected class; (2) he was performing his job satisfactorily; (3) the employer took an adverse employment action against him; and (4) the employer treated at least one similarly situated individual outside of his protected class more favorably.  *See Cerutti v. BASF Corp.*, 349 F.3d 1055, 1060-61 (7th Cir. 2003).  There is no dispute that Ruiz was a member of a protected class according to his race and national origin, and that his termination constituted an adverse employment action.  However, Ruiz fails to establish prongs 2 and 4 of the *McDonnell Douglas* test.

First, Ruiz fails to identify an appropriate comparitor for purposes of establishing a similarly situated employee.  To determine whether an employee is similarly situated, a court must examine all relevant factors, including whether the employees dealt with the same supervisor, were subject to the same standards, and whether they had comparable experience, education and qualifications.  *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).  For this purpose, Ruiz identifies Todd Logue (Caucasian), who according to Ruiz, took nearly a year off from his position at F&C to recover from knee surgery, but was not terminated.  However, Logue proves to be ill-suited as a similarly situated employee, given the disparities between their work backgrounds.  Unlike Ruiz, who had previously been disciplined for excessive absences, Logue did not have an extensive record of

absences prior to taking medical leave. Furthermore, Logue had informed F&C of the date he intended to return to work, whereas Ruiz was unable to provide F&C with any information regarding his return date. Accordingly, Logue is not directly comparable to Ruiz in all material respects. *See id.*

Second, Ruiz also fails to demonstrate that he was performing his job according to F&C's legitimate expectations. As noted above, Ruiz had an extensive history of absences in the years preceding his termination, for which he had been previously disciplined. Following his surgery, Ruiz stated that he would be out for four to six weeks. Ultimately, however, he was absent from work for nearly four months, which prompted F&C to call him at home in order to find out whether he intended to return at all. In response, Ruiz informed F&C that he would not be able to return in the foreseeable future. While Ruiz may have had a legitimate reason for his continued absence, attendance is an essential requirement of employment, particularly in a manufacturing facility. *See, e.g., Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001). Thus, in light of his significant absenteeism and inability to return to work, a reasonable jury could not conclude that Ruiz was meeting F&C's legitimate expectations. For this reason, Ruiz's retaliation claim fails as well. *See Haywood v. Lucent Technologies, Inc.*, 323 F.3d 524, 532-33 (7th Cir. 2003) (affirming summary judgment for employer where an employee could

not demonstrate that she was performing her job in a satisfactory manner).

## B. ADA Claims

The ADA protects "qualified individuals with a disability" from discrimination in employment, the hiring process, or promotions. 42 U.S.C. § 12112(a). Ruiz contends that F&C violated the ADA by terminating him because of his alleged disability, and by failing to accommodate his alleged disability. Under either of these theories, a *prima facie* case under the ADA may be established via indirect method of proof using the same *McDonnell Douglas* framework applicable to Title VII claims. *See DeLuca v. Winer Indus.*, 53 F.3d 793, 797 (7th Cir. 1995). At the outset, the parties dispute whether Ruiz's medical condition qualifies as a disability within the meaning of the ADA (F&C characterizes it as a simple hernia, while Ruiz refers to it as ilioinguinal neuropathy). Yet, even assuming for present purposes that his condition does qualify, Ruiz would still need to establish that, with or without reasonable accommodation, he could perform the essential functions of his job. *Amadio*, 238 F.3d at 927. This Ruiz cannot do, for there exists no reasonable accommodation that F&C could have provided for Ruiz, in light of his complete inability to return to work. Significantly, the Seventh Circuit has recognized under these circumstances that if an employee cannot regularly attend work, he fails to perform an essential function of his job and does not qualify for protection under the ADA. *Id.* at

928. This is especially true of employees in a manufacturing facility, which could not operate effectively if the employees were essentially permitted to set their own work hours. *See id.* (citing *Jovanovic v. In-Sink-Erator Div. Of Emerson Elec. Co.*, 201 F.3d 894, 899 n.9 (7th Cir. 2000).

Ruiz also attempts to utilize the *McDonnell Douglas* framework to demonstrate that F&C terminated him because of his alleged disability. But, as discussed above, Ruiz neither identified a similarly situated employee, nor met F&C's legitimate expectations regarding his job performance. Accordingly, Ruiz's ADA claims must fail.

## C. ERISA Claim

The last of Ruiz's federal claims is brought under § 510 of ERISA. Ruiz contends that F&C violated § 510 when it terminated him, alleging that F&C did so for the purpose of preventing Ruiz from taking advantage of his employment benefits. Section 510 makes it "unlawful for any person to discharge, fine, suspend, expel, discipline or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan. . . ." 29 U.S.C. § 1140. However, the loss of benefits to an employee as a result of an employer's action is not, by itself, sufficient to prove a violation of § 510. "The employer must have the specific intent to deprive an employee of his plan rights." *Isbell v. Allstate Ins.*

*Co.*, 418 F.3d 788, 796 (7th Cir. 2005) (citing *Lindemann v. Mobil Oil Corp.*, 141 F.3d 290, 295 (7th Cir. 1998)).

A plaintiff makes out a *prima facie* case under § 510 if he can show that (1) he belongs to the protected class; (2) was qualified for his job position; and (3) was discharged or denied employment under circumstances that provide some basis for believing that the prohibited intent to retaliate or to prevent the use of benefits was present. *Grottkau v. Sky Climber*, Inc. 79 F.3d 70, 73 (7th Cir. 1996). Here, too, Ruiz is entitled to use the *McDonnell Douglas* burden-shifting framework to prove his ERISA claim, with one important caveat: in a § 510 case, the court need not "determine whether a plaintiff has established a prima facie case if the defendant has advanced a legitimate, non-discriminatory reason for its action." *Lindemann*, 141 F.3d at 296.

The end result, however, is the same. As discussed above, F&C has offered a legitimate justification for its decision to terminate Ruiz, namely, his chronic absenteeism. Ruiz attempts to weave F&C's intent to discriminate out of Czinki's previous comments regarding the rising costs of insurance (*see* Pl. LR 56.1 Statement, ¶ 207), but no reasonable jury could conclude, based on this banal observation, that F&C had the specific intent to deprive Ruiz of any employment benefits. On the contrary, F&C's proffered justification, that Ruiz was terminated as a result of his excessive absences and inability to return to work, is supported by

the manifest weight of evidence. Therefore, F&C is entitled to summary judgment on Ruiz's ERISA claim as well.

## IV. CONCLUSION

For the reasons stated herein, F&C Industries' Motion for Summary Judgment is **GRANTED**.

As for Ruiz's remaining state law claims, a District Court may decline to exercise supplemental jurisdiction over pendant state law claims if the court has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3); *see also Contreras v. Suncast Corp.*, 237 F.3d 756, 766 (7th Cir. 2001)("A district court's decision to relinquish supplemental jurisdiction is the norm, not the exception.")(internal quotations omitted). Accordingly, the Court declines to exercise supplemental jurisdiction over Ruiz's remaining state law claims, which include Counts VII (Intentional Infliction of Emotional Distress), VIII (Assault), IX (Battery), X (Negligent Training and Supervision), and XI (Negligent Retention). Those Counts are therefore **DISMISSED** without prejudice.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Dated: July 12, 2006